Filed 2/27/13  P. v. Perez CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>        **Plaintiff and Respondent,**<br><br>**v.**<br><br>**CHRISTIAN PEREZ,**<br><br>        **Defendant and Appellant.** | **A131692**<br><br>**(Alameda County<br>Super. Ct. No. CH49283)** |

Christian Perez (Perez) appeals from a judgment of conviction and sentence imposed after a jury found him guilty of murder, torture, and other crimes upon two young children.  Perez contends:  (1) the charges that he assaulted one young child in his care should not have been joined with charges that he scalded to death another young child in his care; (2) the prosecutor committed misconduct by mentioning Perez's refusal to give a follow-up statement to police, misrepresenting evidence, and comparing abortion to murder or child abuse; and (3) his attorney provided ineffective assistance of counsel by failing to move for severance of the charges, failing to recall a witness to testify, and failing to object to the prosecutor's closing argument.

We will affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

Perez was charged in an information with aggravated mayhem (Pen. Code, § 205), torture (§ 206), assault on a child causing death (§ 273ab), murder (§ 187, subd. (a)), and

two counts of child abuse (§ 273a, subd. (a)).[1]  The second child abuse count alleged that Perez inflicted great bodily injury on a child under the age of five.  (§ 12022.7, subd. (d).)

The matter proceeded to a jury trial.

A.  *Prosecution Case*

The prosecution produced evidence that Perez abused two children left in his care by different mothers on separate occasions.

1.  *Injuries to K.G.*

N.B. is the mother of victim K.G., a girl born in June 2004, and T.B., a boy born in 2002.  N.B. broke up with the children's father, and the children were removed from her care so she could attend to personal issues, including drug and alcohol counseling.

In 2006, N.B. married Perez and began caring for her children on weekends.  N.B. and Perez lived in a house on Melbourne Avenue in Hayward with Perez's father (Rigoberto), brother, and cousin.  In January 2007, N.B. began a 30-day trial reunification with K.G. and T.G.

a.  *K.G.'s bruises and head injury*

One day in January 2007, N.B. left her children with Perez and his family while she went grocery shopping.  When she returned, she noticed bruises on K.G.'s face.  N.B. took K.G. to Washington Hospital in Fremont for treatment; the police arrived at the hospital but allowed N.B. to take K.G. home.

On January 24, 2007, N.B. again left K.G. with Perez.  When she returned, she saw that K.G. had an open cut on her head and blood in her hair.  Perez claimed that K.G. had fallen in a park.  N.B. took K.G. to Children's Hospital in Oakland for treatment of the cut, and to have other bruises examined as well.

b.  *Perez's explanations to police*

Hayward police officer Aurel Agustin was dispatched to Children's Hospital, where he observed that K.G. had purple, yellow, green, and red bruises.  Officer Agustin spoke with N.B. and interviewed Perez, neither of whom were under arrest at the time.

---

[1]     Unless otherwise indicated, all statutory references are to the Penal Code.

2

N.B. claimed that the bruises had occurred over four to five weeks, and Perez's parents, sister, cousins, and friends and other relatives had been in the house during this period. In her view, K.G. did not appear afraid of Perez.

Perez told Officer Agustin that K.G. had sustained a bruise on her back the previous day, when she slipped in the bath and hit her back on a soap dish. He did not attempt to explain K.G.'s other bruises. He claimed, however, that K.G. had bruises on her cheek and legs when they first received her from her foster parents.

Perez also told police that K.G. had hit her head on a park bench earlier in the day. He recounted that he was leaving the park with K.G., realized she had left her jacket behind, and went to retrieve it, when he heard K.G. cry. Perez turned and saw K.G. on her stomach with her arms out, crying. He picked her up and realized she was bleeding from the back of her head.

Officer Agustin observed that K.G. was active and engaged with N.B. at the hospital, but K.G. was very quiet with Perez, who was "fixated" on watching television.

Officer Agustin accompanied Perez to the park where Perez said K.G. had fallen. Perez showed Agustin the bench on which Perez claimed K.G. had struck her head, but the officer did not see blood or hair on the bench or others nearby.

Officer Agustin also accompanied Perez back to his house. When Perez's father (whom Perez would later blame for the injuries at trial) and brother arrived, neither of them seemed overly nervous notwithstanding the officer's presence, and both appeared tired. Perez told Agustin that his father and brother worked two full-time jobs, were rarely home, and did not take an active role in caring for the children. N.B. also informed police that K.G. had not been alone with anyone other than N.B. and Perez.

Detective Scott Navas subsequently contacted Perez and N.B. and asked if they would speak with him. N.B. gave Detective Navas a statement. Perez, however, told the detective that he had already given a statement and, if the detective had anything to ask, he should contact Perez's lawyer.

*c. Dr. Crawford's opinion that K.G. was beaten*

Dr. James Crawford-Jakubiak (Dr. Crawford), a pediatrician and the medical director of the Center for Child Protection at Children's Hospital in Oakland, observed K.G. and photographs of her taken around the time of her admission to the hospital.

Dr. Crawford noted that before K.G. lived with Perez, she had been described as healthy and uninjured. After about three weeks in Perez's home, K.G. had serious injuries in locations not normally seen in the type of accidents typical of young children. When K.G. was removed from Perez's home, the injuries went away. Based on the time frame in which K.G.'s injuries appeared and resolved, as well as the number, pattern, and locations of the injuries, Dr. Crawford opined that K.G. "was clearly being physically beaten, injured by somebody." Noting the facial bruising observed earlier in the month at a different hospital, the additional significant bruising indicated that K.G. had suffered at least two incidents of abuse. He ruled out the possibility that K.G.'s injuries could have been inflicted by her four-year-old brother.

K.G. had a contusion on her liver from being struck with something on her abdomen. Her other injuries included: two bruises on her upper left thigh, caused by separate blows from a solid object like a wooden dowel; a bruise on her earlobe, which is very uncommon except in cases of abuse and tends to be "highly correlated with serious, sometimes fatal child abuse"; a "very large bruise" on her cheek that was "very unusual"; unusual bruises on her shoulders; an upper arm bruise, deepest around the edges, suggesting K.G. had been bitten; several bruises on her back that were "exceedingly uncommon in children this age"; uncommon bruises on the inner part of both knees; and an uncommon bruise in the middle of her chest.

Neither K.G. nor T.G. was returned to N.B.'s care and custody, as N.B. agreed they should be placed with their grandparents. N.B. saw her children once a year and never again observed bruises on K.G.

2. *The Abuse and Murder of Eli*

Eli was born in November 2006 to Katherine Rojas (Rojas). Rojas met Perez in October 2007, and in February 2008 she moved into the Melbourne Avenue house with

4

Perez and his father Rigoberto, brother, and cousin. About one week earlier, Perez had told her that N.B.'s little girl, K.G., had bruises all over her body because she had cancer.

Around February 2008 – roughly two months before Eli was injured – Rojas became pregnant with Perez's child. When Rojas informed Perez, he told her that he did not want a baby and she should have an abortion. Nonetheless, Rojas thought that Perez was kind to Eli, he had not objected to Eli living with him, and Eli appeared comfortable around him.

Typically, Rojas would leave the house for work by 6:00 a.m., Perez would take Eli to a babysitter at 7:00 a.m., and Rojas would return around 2:30 p.m. and cook and take care of Eli. On April 24, 2008, however, Eli was sick and stayed home with Perez.

*a. Eli burned*

Rojas checked her cell phone around noon and noticed she had missed calls from Perez. She called Perez, who informed her that Eli had burned his hands and they looked red. Perez's voice sounded normal, and he did not disclose how Eli had been burned or that Eli needed to see a doctor.

At some point, Perez called his sister Patricia Perez (Patricia), saying that Eli had been burned and that Patricia and her husband, Jose Gamez (Gamez), should come to his house on Melbourne Avenue. When they arrived, Gamez asked Perez and his cousin what happened to Eli; Perez did not reply, and his cousin said he did not know. Perez later told Patricia that he was giving Eli a shower in the tub and had run out to get a towel, but he refused to give Patricia any further details. Perez's father was not there.

Eli was on the bed wearing only a diaper. His legs were very red but his upper body had a different skin tone. Gamez recalls that he immediately said Eli needed to go to the hospital, Perez looked worried, and Patricia was crying. Patricia recalls that Perez also said Eli had to be taken to the hospital.

Although the witnesses recalled the events somewhat differently, around this time Patricia spoke with Rojas on the phone, told her that Eli was burned without elaborating on the burn's severity, initially told Rojas that she needed to come home, and then later arranged to pick up Rojas from work and proceed to the hospital. As Gamez drove Perez,

5

Patricia, and Eli towards Rojas's workplace, however, Patricia said that Rojas had told her to get burn cream for Eli, so they stopped at a store and purchased some.

Perez, Patricia, Gamez, and Eli then went to Patricia and Gamez's house, where Patricia took Eli to the master bedroom and instructed Perez to fill a basin with cold water. Patricia was crying as she applied the burn cream.

Suddenly, Eli began foaming at the mouth and convulsing, and his eyes rolled back in his head. They put Eli in the car and drove toward the hospital, without fetching Rojas. On the way, Patricia screamed, "The baby is dying. The baby is dying. Call 911." Perez called 911, and the dispatcher told them to pull over. Gamez pulled into the Department of Motor Vehicles (DMV) parking lot, and soon the fire department and ambulance arrived.

### b. Observations of paramedics Hamre and Buck

Ryan Hamre and Christopher Buck were paramedics with the Hayward Fire Department who received the initial dispatch regarding a child having seizures in the DMV parking lot. When they arrived, they saw a woman holding an unclothed child with severe red burns over half of his body. The child was not crying, which Hamre considered "an extremely bad sign." The paramedics provided oxygen and inserted an interosseous line.

After the ambulance arrived, ambulance paramedic Ben Lopez ventilated Eli while paramedic Buck performed CPR (cardio-pulmonary resuscitation). At trial, Buck testified that a bruise apparent in a photograph of Eli's chest was higher than the area in which he would have been pressing during CPR. Lopez testified that he saw Buck perform chest compressions using "[a]n approved method of encircling the hands around the chest with the thumbs over the sternum at roughly the nipple line, so the line that would be drawn horizontally across your chest at the area of the nipples," and compressing with the thumbs. Lopez further confirmed that Buck had performed CPR on Eli properly.

6

Buck rode with Eli in the ambulance. He established a nasopharyngeal airway to keep Eli's airway open. Eli did not gag when the tube was inserted in his throat, another sign that his condition was "really deteriorating."

### c. Officer Stiver's observations at the parking lot

Hayward Police Sergeant Keith Stiver had responded to the parking lot, where he found Eli lying naked on a gurney with the worst immersion burns he had ever seen outside of training. Stiver believed the burns resulted from an intentional act and the child was not likely to survive. It was clear from the burn pattern that Eli had been held in water that was already scalding. It was not possible that Eli had been in a bath that gradually overheated: Eli's burns were "incredibly traumatic and no child would sit there while that water heated up to that extent and allow themselves to be burned like that. They would be struggling to get out of the water." The absence of a significant amount of splash burns on Eli's upper body showed he had been held in the water.

### d. Perez's statements to police

Sergeant Stiver interviewed Perez in the parking lot. Perez stated he was in the shower with Eli when the burns occurred, but it was apparent to Stiver that Eli's burn pattern could not have been caused by a shower.

A short time later, Hayward Police Officer William Edwards interviewed Perez after the medical personnel had departed with Eli. He found Perez to be "strangely calm." In over 200 calls in which he spoke with an adult who had care or custody of an injured child, he never observed a demeanor so calm. Perez gave Officer Edwards a "very quick" statement that he was bathing Eli when the water suddenly turned very hot, scalding him.

Officer Edwards asked Perez to accompany him to the police station for a further interview. During the interview, Perez never asked how Eli was doing or showed any concern for him. After the interview, Perez was arrested.[2]

---

[2] Gamez and Patricia were also arrested; they later pleaded guilty to being an accessory (§ 32).

7

*e. Police Officer Edens' observations at the hospital*

Aaron Edens, a Hayward police officer and formerly a paramedic, responded to the Children's Hospital Pediatric Intensive Care Unit (ICU) to photograph Eli. When he arrived, Eli was semiconscious and writhing, and medical personnel were administering pain medication and chemical paralytics to prevent Eli from dislodging his breathing tube. It was the most morphine Edens ever saw administered to a child.

Edens observed second degree burns over half of Eli's body. There was a clear line of demarcation around the level of Eli's nipples, with the skin above that point intact. There were some less significant burns on Eli's right arm. The skin around his knees had fallen off. In addition, Edens noticed bruising to the right of Eli's sternum. The bruise on Eli's chest was unlike anything Edens had seen on a child, and he did not believe it was inflicted by someone performing CPR (unless the rescuer's hands had been misplaced).

*f. Rojas' return home and stay with Eli until his death*

Rojas – whom Perez and Patricia never picked up – arrived home after work, expecting to see Eli. An officer drove her to the hospital, where she learned that Eli was in surgery and she could not see him. Rojas was then taken to the police station for questioning and returned to the hospital later to see Eli. Rojas slept with Eli at the hospital that night. The next day, Eli was taken to Children's Hospital in Sacramento, where Rojas stayed with Eli until he died on June 24, 2008.

*g. Inspection of the water heater*

On April 30, 2008, police and building inspector Dennis Zafiratos checked the hot water at Perez's house on Melbourne Avenue. Hayward Police Inspector Coffey confirmed that the setting on the water heater was the same as the day Eli was burned. Zafiratos noted that the temperature control on the water heater was set "unusually high." The bathtub did not have a stopper, and the residents used a sock instead.

Rojas had testified that, if a person was showering and the faucet in the kitchen or bathroom was turned on, the water in the shower became "really, really hot," but not so hot that it caused burns. Zafiratos confirmed that turning on the cold water in the kitchen

or bathroom or flushing the toilet increased the bath water temperature by only about two or three degrees. Adjusting the temperature on the water to the maximum, the tub water measured 150 degrees.

### h. Dr. Crawford's examination of Eli at the hospital

Dr. Crawford saw Eli shortly after he was transported to Children's Hospital, where he was in ICU with very serious burns to a large percentage of his body. The burns had been "horribly painful" and were clearly caused by being enveloped in hot liquid.

On the front of Eli's body, all of the skin from the belly button down had peeled off. On his back, there was a diagonal burn line extending up towards his right shoulder. His right upper arm had been under water only in the back, and everything from the hand up to the elbow was unburned.

The burn pattern showed that Eli had been exposed to very hot water. Eli's groin and the backs of his knees were relatively unburned. If the water had been cooler, he would have been moving over time and those areas would have been more evenly burned.

Dr. Crawford concluded that Eli had been "placed into a standing reserve of very hot water" in a somewhat reclined position. When a child of Eli's age sits in a bathtub, he supports himself with his hands and cannot recline without using his hands, so the hands are always wet. But Eli's hands were not burned, indicating that Eli had not gotten in or out of the tub on his own, and he had not been "in the water in an uncontrolled fashion."

The burn pattern also showed that Eli had not been sitting in comfortable bath water that suddenly turned hot. If he had been, there would have been unburned marks on his buttocks. The water temperature was at least 140 degrees and Eli had been held in the water for about five to 10 seconds.[3]

_____

[3] Dr. Crawford explained that the hotter the water, the less time it takes to burn the skin. Bath water is normally in the range of 90 to 100 degrees, and burns will not occur no matter how long the exposure. At 110 degrees, the water would be uncomfortable but

9

On cross-examination, Dr. Crawford confirmed that Eli was likely burned in a single act; he was placed in the water and then removed by the same person. His burns did not give the appearance of one person putting him in the water and another struggling to keep him out. The only likely scenario was that someone turned on the water, waited for it to get hot, put in the stopper, waited for the basin to fill, put Eli in and then took Eli out. If perpetrated by more than one person, it would have to have been an "orchestrated two-person activity," "a choreographed, I'll-put-him-in, you-take him-out thing."

Dr. Crawford also observed a bruise on Eli's chest that occurred some time before Eli was burned. The bruise was "pretty close to the same location" as the bruise he had observed on K.G.'s chest.

### i. Autopsy of Eli

In June 2008, Dr. Mark Super, a forensic pathologist, performed an autopsy on Eli at the coroner's office. Eli's back showed a clear demarcation of burned skin from the mid-back down. The bottoms of his feet and the back of his knees had been spared, "characteristic of inflicted scald injuries in which the child has folded their legs." Eli's lungs were severely damaged, his small bowel was perforated, his kidneys showed evidence of shock, his liver was inflamed, and he had a medication-resistant staph infection caused by the lack of skin.

Dr. Super determined the cause of death to be sepsis (infection) and "organizing ARDS [adult respiratory distress syndrome] due to complications from scald burns." Eli had "multiple complications, but they're all directly related to the fact that he had injury to his overall system from burn, because burn injures skin, which is the protection of our internal organs. When our skin is injured, we can't protect our internal organs from infection and shock. That's how burns kill."

---

would not cause burns. At 120 degrees, the water would take a few minutes to burn, and 130-degree water would cause burns in about 30 seconds. At 140 degrees, skin would burn in a few seconds, and 150 degree water would burn skin in one to two seconds.

10

B. *Defense Case*

At trial, Perez changed his story and, for the first time, blamed his father, Rogoberto, for both the injuries to K.G. and the death of Eli.

1. *Injuries to K.G.*

Perez testified that his father Rigoberto did not approve of his marriage to N.B. and did not agree to have N.B.'s children move into the house. Rigoberto disliked N.B., argued with her, and wanted her to move out. The children irritated him when he was watching television, and he got mad at them for waking him in the morning. He told Perez and N.B. to find another place to live, but they had nowhere to go.

After less than a month of living in the house, K.G. began getting bruises. Perez did not know their source; Rigoberto denied inflicting them and was upset at Perez's accusation. After Perez spoke with Rigoberto, however, K.G. did not get bruises for about a week. When bruises started to appear again, Perez believed Rigoberto was responsible and told him to stop. Rigoberto then ordered Perez to leave the house, but N.B. decided it would be best if the children went to live with their grandparents. N.B. eventually moved out as well, after an argument with Rigoberto. Perez claimed that he loved K.G. and T.G., played with them, and had no discipline problems with them.

When the police were investigating K.G.'s bruises, Perez did not tell them about his father because Perez wanted to protect him, since his father had had "problems with the law."

2. *Death of Eli*

Rojas moved in with Perez a few months after N.B. moved out. Perez was still married to N.B. but had developed a romantic relationship with Rojas. According to Perez, he loved Rojas's son Eli, who called him "dada."

When Eli woke up on April 24, 2008, Perez gave him his bottle, went to make coffee, and then started Eli's bath. Perez made sure the water was the right temperature and stuffed the drain with a sock to fill the tub. He filled the tub with 12 to 18 inches of water, put Eli in, and washed and shampooed him for less than five minutes. Perez had forgotten to bring a towel, so he asked Rigoberto to watch Eli while he got one. While he

11

was getting the towel, he received a telephone call and talked for about three minutes, until he heard Eli screaming. Perez went to the bathroom and saw Rigoberto putting Eli in the tub or taking him out. Perez tried to grab Eli away from Rigoberto, got Eli out of the tub, rinsed him, and took him to the bedroom. Eli was crying, and Perez saw that he was burned. Perez told Rigoberto he was going to take Eli to the hospital, but Rigoberto urged him not to because the police would come and Rigoberto would get in trouble. So Perez called his sister Patricia instead.

Perez told Patricia what happened to Eli and asked her to come to the house. He tried to call Rojas, but she did not answer her phone. Perez told Rigoberto he was going to take Eli to the hospital when Patricia arrived, so Rigoberto left the house. Rigoberto said he did not want to be there when the police came because he had been deported twice, and he instructed Perez not to tell the police that he or Perez's cousin had been home.

When Patricia arrived, Perez told her they were going to take Eli to the hospital. Patricia, however, took over and they went to the store to buy burn cream, after she had spoken with Rojas on the phone. Perez did not know how serious the burn was until they were at Patricia's house.

On the way to the hospital, Perez called 911 to get an ambulance; he tried to tell the dispatcher where they were, but Gamez would not stop driving. Finally the dispatcher told them to pull into the DMV parking lot. In the parking lot, the police asked Perez if they could interview him at the station and he agreed.

Perez did not tell the police that his father was the one who burned Eli, because Perez was trying to protect him. Perez loved his father and was grateful that he brought him to the United States from Mexico and worked hard so Perez could get a good education. Since the incident with Eli, however, Perez had seen Rigoberto only twice, and on one occasion Rigoberto reminded Perez not to mention him to the police. It was not until a month after Perez was arrested that Perez realized the severity of the matter. He denied putting the hot water in the tub and felt terrible about Eli's scalding.

12

### 3. *Cross-Examination*

On cross-examination, Perez testified that on the day K.G. was taken to Children's Hospital, he and his father had taken K.G. and T.G. to the park. When he talked to the police about her injury, he neglected to mention that T.G. and Rigoberto were also there. Perez's story to the police – that Perez walked back to retrieve K.G.'s jacket – was untrue. Instead, Perez had been playing with T.G., and Perez's father was playing with K.G., when Perez heard K.G. scream. K.G. was on the ground and Perez picked her up; he did not know she was bleeding until he saw blood on his clothes. Perez brought K.G. home to N.B. and then left for work.

Perez admitted that he told Patricia that Eli had been accidently burned in the shower, and that he had never told anyone before trial that his father had burned Eli.

### C. *Prosecution's Rebuttal Evidence*

Steven Worthington, the co-owner of A&B Roofing, testified that Rigoberto worked for him in January 2007 (when K.G. was hurt) and April 2008 (when Eli was killed). Employees work from 7:00 a.m. to 3:30 p.m. or later, with a 30-minute onsite lunch break starting anywhere from 11:00 a.m. to 12:30 p.m. Employees are not to leave the site during the lunch break, although Worthington acknowledged that he would not know if an employee left the site unless another person reported it to him. Worthington paid his employees only for the hours they actually worked.

Rigoberto worked on January 24, 2007, and was paid for eight hours of work in Redwood City on April 24, 2008, indicating that either Worthington or his brother had seen Rigoberto at the start and completion of the work day.

### D. *Jury Verdict and Sentence*

The jury convicted Perez on all counts before it.[4]

The court sentenced Perez to an aggregate term of 30 years, four months, to life in state prison, comprised of the following: 25 years to life on count 3 (§ 273ab); a

---

[4]     On the first day of trial, the prosecutor dismissed count 1 (aggravated mayhem). At the end of testimony, the prosecutor dismissed the great bodily injury allegation on count 6.

13

consecutive four years on count 5 (§ 273a, subd. (a));  and a consecutive one year four months on count 6 (§ 273a, subd. (a)).  Sentence on counts 2 and 4 was imposed but stayed pursuant to section 654.

This appeal followed.

## II.  DISCUSSION

Perez contends: (1) the charges against him as to victim K.G. were improperly joined with the charges against him as to victim Eli; (2) the prosecutor committed misconduct; and (3) his attorney provided ineffective assistance of counsel.  We address each of Perez's contentions, albeit in a different order than set forth in Perez's opening brief.[5]

A.  *Joinder of the Charges*

Perez argues that the joinder of the charges involving K.G. with the charges involving Eli denied him due process, because the charges involving K.G. were weaker than those involving Eli.  Perez has waived this argument.

Under section 954, offenses of "the same class of crimes or offenses" may be alleged in one pleading for joint trial.[6]  The court has discretion to sever the offenses in the interest of justice and upon a showing of good cause.  (§ 954.)

---

[5]     In addition, Perez raises a new argument in his reply brief.  He contends that the amended complaint filed against him on May 20, 2008, which added two counts arising from the offenses upon K.G. to the counts arising from the offenses upon Eli, was filed without a motion or court appearance.  Although section 1009 permits the addition of counts that might have been properly joined in the original complaint, Perez urges there was error because the trial court made no inquiry or findings about the propriety of the joinder.  His argument is unavailing.  First, Perez did not object to the joinder or the filing of the amended complaint in the trial court, so the challenge is waived on that ground.  Second, Perez did not raise this issue in his opening brief on appeal, so the matter is waived on that basis as well.  (*REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.)  Third, Perez fails to establish any prejudice arising from the joinder, as explained *post*.

[6]     Section 954 provides:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under

14

Here, however, Perez never asked the trial court to sever the charges. As California courts have held for nearly 150 years, the failure to object to the joinder of charges in the trial court precludes a challenge to the joinder in this court. (See *People v. Champion* (1995) 9 Cal.4th 879, 906; *People v. Saunders* (1993) 5 Cal.4th 580, 589-590; *People v. Garnett* (1866) 29 Cal. 622, 625-626.) Moreover, the trial court has no sua sponte duty to sever. (*People v. Hawkins* (1995) 10 Cal.4th 920, 940.) Because Perez did not object to the joinder of the charges, he cannot challenge it now.[7]

B. *Prosecutorial Misconduct*

Perez argues that the prosecutor committed misconduct during closing argument by: (1) mentioning Perez's refusal to give a follow up statement in the investigation of the abuse of K.G.; (2) misrepresenting the evidence by stating that K.G. and Eli each had a bruise in the same place on their chests; and (3) comparing Perez's desire for Rojas to have an abortion with the abuse of K.G. and Eli.

The standard for review of alleged prosecutorial misconduct is well-established. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, ' "the question is whether there is a reasonable

---

separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. …"

[7] To the extent Perez urges that his attorney's failure to object or move for severance constitutes ineffective assistance of counsel, we address the issue *post*.

15

likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

### 1. *Prosecutor's Argument that Perez Did Not Give A Follow-Up Statement*

In closing argument, the prosecutor referred to evidence that Perez had not given the police a follow-up statement in K.G.'s abuse investigation. Perez urges that this remark was analogous to the error identified in *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), in which the court held "that the use for impeachment purposes of petitioners' silence, *at the time of arrest and after receiving Miranda warnings*, violated the Due Process Clause of the Fourteenth Amendment." (*Doyle, supra,* 426 U.S. at p. 619, italics added.) The court in *Doyle* explained that, once people have been arrested and advised of their right to remain silent, a comment on that silence unfairly penalizes them for exercising their rights under *Miranda v. Arizona* (1966) 384 U.S. 436. (*Doyle, supra*, at pp. 616-618.) *Doyle* is inapposite to the prosecutor's remark that Perez now challenges.

### a. *The prosecutor's argument*

At trial, Hayward Police Detective Navas testified to his understanding that K.G. had been taken to Children's Hospital on January 24, 2007. As part of his investigation into K.G.'s injuries, he asked Perez and N.B. to meet him at the Hayward Police Department on January 29, 2007. Perez and N.B. – *neither of whom was under arrest* – arrived at the police department together. N.B. provided a statement. But when Detective Navas asked Perez if he would speak with him, Perez replied "that he'd already given a statement, and that if I had anything to ask him, to contact his lawyer." Perez and N.B. left.[8]

During closing argument, the prosecutor stated: "[N.B.] told Detective Scott Navas that she and [Perez] were the only two people who cared for K.G. And [Perez]

---

[8] At trial, Perez did not remember telling Detective Navas that he should talk to Perez's lawyer if he had further questions. He acknowledged that when he was at the police station during the investigation of K.G.'s injuries, he was not under arrest and left the building with N.B.

told Officer Agustin that he and [N.B.] were the only two people who cared for K.G. [Perez's] written statement to Officer Valencia states over and over and over that he was the only person with K.G. when she split her head. I, I, I, I. [¶] And [Perez's] immediate response was not let's go to the hospital together, not let's get this baby the care that she needs. His immediate response was, here you go, I'm going to go to work. That was his response. [¶] *He refused in the days following to give a follow-up statement*. Here's this baby who you care about and you love, bruised from head to toe, and you're not willing to tell the police everything you know." (Italics added.)

Defense counsel objected in the following colloquy: "MR. GRIM [DEFENSE COUNSEL]: Your Honor, I object to that as using a constitutional right, arguing that shows guilt, and that's against the law. [¶] THE COURT: Overruled. The defendant's testimony speaks for itself. Whatever was said and whatever the jury decides in the facts, that's at issue here. Move on, Counsel. [¶] MS. PETTIGREW [PROSECUTOR]: My reference with that was in reference to him accompanying [N.B.] to the police department, everyone out of custody, and [N.B.] doing everything she can to figure out what happened to her baby."

### b. Analysis

As Perez acknowledges, the prosecutor's remark that Perez had not given a follow-up statement was not *Doyle* error, because *Doyle* dealt with a defendant's assertion of his right to remain silent *after* arrest and *after* being advised by the police of this right under *Miranda*. At the time Perez refused to speak with Detective Navas, Perez had not been arrested, had not been told he had to answer police questions, and had not been Mirandized.

Nonetheless, Perez contends this was "*Doyle*-like error" because Perez's refusal to give a follow-up statement could have been an assertion of his Sixth Amendment right to have a lawyer present at any follow-up interview or his Fifth Amendment right not to give any further statement based on advice of counsel. Perez argues that his situation should be protected because the prosecution should not be permitted to use his invocation of a constitutional right by arguing it showed his guilt.

17

Perez is incorrect. In a case decided after *Doyle*, the United States Supreme Court held that "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility," and "impeachment by use of prearrest silence does not violate the Fourteenth Amendment." (*Jenkins v. Anderson* (1980) 447 U.S. 231, 238, 240.) As to the latter, the court in *Jenkins* explained: "In this case, no governmental action induced petitioner to remain silent before arrest. The failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case." (*Id.* at p. 240.)

Here too, no governmental action induced Perez to remain silent before arrest. His refusal to speak to Detective Navas occurred before he was taken into custody and given any *Miranda* warning. Under *Jenkins, supra,* 447 U.S. 231, the use of Perez's prearrest silence to impeach his testimony at trial – that he loved K.G. and was not the one who harmed her – did not violate his constitutional rights; accordingly, there was no prosecutorial misconduct.[9]

Perez's reliance on *Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080 (*Hurd*) is misplaced. In *Hurd*, *after* the defendant was arrested and read his *Miranda* rights, he agreed to talk to the police without his attorney present, but then refused the officer's request to demonstrate how a shooting had occurred. Throughout the trial, the prosecutor referred to Hurd's refusal to re-enact the shooting as affirmative evidence of his guilt.

---

[9]     Respondent asserts that in this case, the comment pertained not only to impeachment of Perez but also "came in" during the prosecution's case in-chief, giving rise to an issue that respondent believes was left open by *Jenkins*. (Citing *Jenkins, supra*, 447 U.S. at p. 236, fn. 2.) Perez's challenge in this appeal, however, is not to the prosecutor's admission of the evidence of Perez's refusal to give a follow-up statement, but to the prosecution's use of that evidence in closing argument. Moreover, the evidence was used in closing to impeach Perez's testimony at trial that he loved K.G., he did not harm K.G., and it was his father who did it. Both here and in *Jenkins*, pre-arrest, pre-*Miranda* silence was used against a defendant who testified at trial. (See *Jenkins, supra*, 447 U.S. at p. 234 [prosecutor argued in closing against defendant's claim of self-defense by pointing out that he did not report the stabbing for two weeks].) The matter falls squarely under the holding in *Jenkins*, and Perez presents no argument to the contrary.

(*Id.* at p. 1084.)  The court held that, because the defendant invoked his *Miranda* rights when he refused to demonstrate how the shooting occurred, the prosecutor's comments on his silence violated his rights under *Doyle*.  (*Id.* at pp. 1088-1089.)  *Hurd* is inapposite, since Perez's refusal to give a follow-up statement occurred *before* he was arrested and *without* receiving a *Miranda* warning.

In any event, the prosecutor's argument did not infringe on Perez's right to remain silent.  After all, Perez testified at trial, and he fails to show how a comment on his prior refusal to speak could violate the self-incrimination privilege that he ultimately waived.  (See *People v. Redmond* (1981) 29 Cal.3d 904, 910-911 [prosecutor's argument, that defendant's two-month delay in disclosing the location of a knife was evidence of defendant's guilt, did not violate the Fifth Amendment right against self-incrimination where defendant testified at trial].)

Perez fails to establish prosecutorial misconduct.

### 2. *The Prosecutor's Argument That K.G. and Eli Had Bruises On Their Chests*

Perez next contends the prosecutor misrepresented the evidence when she asserted in closing argument that K.G. and Eli had "the exact same bruise in the exact same place."  This, Perez argues, insinuated that Perez had inflicted both bruises and had abused both children.  He urges:  "This was a very serious misrepresentation of the evidence since Eli had been burned, not beaten, and the evidence showed that his chest bruising near the sternum was caused by the fire department paramedic performing CPR on the baby on the way to the hospital and not any act of an abuser.  (RT, vol. 1 pp. 139-144, 170-171, 222.)"  To support this contention, he represents that paramedics Buck, Lopez, and Edens testified "that the bruise on Eli's chest near his sternum was caused by Eden performing CPR / chest compressions on [Eli] in the back of the ambulance on the way to the hospital."  Perez's argument is untenable.

Here, it is Perez – not the prosecutor – who misstates the evidence.  Contrary to Perez's representation, there was no evidence from the paramedics that Eli's bruise was caused by CPR.  Buck testified that he performed CPR on Eli in the ambulance en route

to the hospital, and that a photograph of Eli showed a bruise "pretty close" to, but *higher than,* where he performed the chest compressions. Lopez did not even mention bruising in his testimony in the pages of the reporter's transcript that Perez cites. Edens looked at a picture of Eli's bruise and stated he had "never seen bruising like that on a pediatric patient," if it had been associated with CPR "it would indicate that the rescuer's hands were *mis*placed," and he did *not* believe the bruise was inflicted by someone performing CPR. Edens did not state that Buck's hands were misplaced or contradict Buck's testimony that the bruise was higher on the chest than the location on which Buck was pressing during CPR. To the contrary, Lopez testified that he saw Buck perform CPR *properly* using an "approved method."

Moreover, "[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Here, the prosecutor's remark was taken almost verbatim from the testimony of Dr. Crawford. Dr. Crawford testified that K.G. had a bruise in the middle of her chest that, while not large, was a significant indicator of nonaccidental injury because of its unusual location for a two-year-old child. Dr. Crawford also noted that Eli also "had a bruise *pretty close to the same location* as [K.G.] did above the nipple line, below his neck in the middle of his chest." Furthermore, Dr. Crawford opined that Eli's chest bruise occurred before he was burned. The prosecutor's remark was a fair commentary on the evidence.

Perez fails to establish prosecutorial misconduct.

3. *Prosecutor's Reference to Perez's Desire that Rojas Obtain an Abortion*

Lastly, Perez contends the prosecutor committed misconduct by repeatedly arguing that the jury could use Perez's desire for Rojas to get an abortion as evidence that he had beaten K.G. and murdered Eli. Acknowledging that defense counsel did not object to the prosecutor's remark, Perez urges that we nonetheless review the prosecutor's statement because it was so contrary to the public interest; he warns that the "prosecutor's argument would literally make thousands of law-abiding women in

20

California criminal suspects." Without accepting Perez's characterization, we will consider the matter on the merits.

### a. Prosecutor's statement

At trial, Rojas testified that about two months before Eli was burned, she told Perez she was pregnant with his child. Perez told Rojas he did not want the child and she should abort it, but she refused. Perez, on the other hand, testified that he loved K.G., T.G., Eli, and the family life he shared with them.

In closing argument, defense counsel used Perez's testimony to argue that Perez had a good relationship with the children and no motive to harm them, while Rigoberto did not like the children and had a motive to harm them so they would move out.

In rebuttal, the prosecutor countered defense counsel's argument that Perez had no motive to hurt the children: "As far as motive, [Perez] talked about Rigoberto . . . not liking kids, not wanting the kids around, wanting them to leave. [N.B.] told you that she got into it with him, but never told you anything about him having anything to do with K.G. or treating her badly. [¶] [Perez] didn't want kids. Out of his own mouth, he told [Rojas] to abort that baby less than a month before he burned Eli. Get an abortion. I don't want kids. Do you think it's just a coincidence that both of these babies were brutally injured within a month of moving into his house? What clearer motive do you need that he doesn't want to be stuck taking care of these babies?"

### b. Analysis

Perez suggests that the prosecutor was appealing to anti-abortion sentiments or divine justice, or asking Alameda County jurors to dislike Perez and convict him because he wanted Rojas to have an abortion. No reasonable juror would have believed, however, that this was the purpose of the prosecutor's argument. The prosecutor did not mention Perez's abortion request until after defense counsel argued that Perez loved the children so much that he had no motive to harm them. When the prosecutor did mention Perez's preference for an abortion on rebuttal, it was clearly intended to counter the defense argument that he had no motive to harm the children, in that Perez's telling Rojas to abort his own child demonstrated that he "doesn't want to be stuck taking care of these babies"

21

already in the house. While it may not have been the most prudent or tasteful argument, it was nonetheless a fair commentary on the evidence introduced at trial and, as such, not misconduct. (*Ledesma, supra,* 39 Cal.4th at p. 726.)

Perez fails to establish prosecutorial misconduct.

C. *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) prejudice flowing from counsel's performance or lack thereof. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) To establish deficient performance, an appellant must establish that "the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) To establish prejudice, the appellant must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

1. *Failure to Move for Severance*

Perez asserts that trial counsel was ineffective because he did not move to sever the charges involving K.G. from the charges involving Eli. But Perez fails to establish either element necessary for relief – that counsel's failure fell below an objective standard of reasonableness or that there is a reasonable probability the outcome would have been better for Perez if his attorney had moved for severance – since he fails to establish that the joinder of the charges was prejudicial.

Section 954 permits the joinder of "offenses of the same class of crimes." Clearly, the charges as to K.G. and the charges as to Eli met this standard: two child abuse offenses, one resulting in death and one resulting in multiple injuries, are of the same class of crimes. (See *People v. Maury* (2003) 30 Cal.4th 342, 395 [rape and murder are

properly joinable under § 954 as " 'offenses of the same class of crimes,' " since both are assaultive].)

Where, as here, the statutory requirements for joinder are met, a trial court still has discretion to sever charges in the interest of justice and upon a showing of good cause. (§ 954.) However, a denial of severance is within the court's discretion – and will be upheld on appeal – unless the defendant makes a sufficiently clear showing of prejudice arising from the joinder. (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 557 (*Sullivan*).) Moreover, there is a strong preference for joint trials of similar offenses committed by a defendant, in light of the case-specific efficiencies and systemic economies that result. (*People v. Soper* (2009) 45 Cal.4th 759, 771-772 (*Soper*); *Sullivan, supra*, 151 Cal.App.4th at p. 557; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218.)

A motion to sever will properly be denied where the evidence underlying the charges as to one victim would be cross-admissible in the prosecution of the charges as to the other victim. (*Soper, supra*, 45 Cal.4th at pp. 774-775.) Indeed, "[i]f the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Ibid*.)

Here, the evidence as to the offenses upon K.G. and the evidence as to the offenses upon Eli was cross-admissible. Perez was charged with abusing two children with whom he lived. Under Evidence Code section 1109, evidence of the events involving one child was admissible in the trial for the events involving the other child, as both child abuse and domestic violence. (*People v. Dallas* (2008) 165 Cal.App.4th 940, 952-957.) And although the admissibility of this evidence would have been subject to Evidence Code section 352, Perez does not show that the evidence would have been inadmissible under that statute.[10]

---

[10]     Evidence Code section 352 gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice. . . ." The evidence that Perez abused Eli

Because the cross-admissibility was apparent when a timely motion to sever would have been brought, it was not incompetent for Perez's attorney to refrain from bringing a motion to sever. Moreover, there is no reasonable probability that the outcome would have been better for Perez if his attorney had brought the motion, since the motion would have likely been denied, with the denial upheld on appeal.

Furthermore, even if the evidence was not entirely cross-admissible, there is no reasonable probability that counsel's filing a severance motion would have done Perez any good. In the absence of cross-admissibility, the question becomes " 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]" (*Soper, supra*, 45 Cal.4th at p. 775.) Factors considered in this determination are: (1) whether some of the charges are likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (3) whether one of the charges is a capital offense or converts the matter into a capital case. (*Ibid*.) Any such prejudice is then weighed against the state's interest in a joint trial. (*Ibid*.)

Perez's attempts to show prejudice are unpersuasive. Primarily, he argues that the case against him as to K.G.'s injuries was weak, and the joinder hurt him because the case against him as to Eli's injuries was stronger. The record, however, does not show

had significant probative value in the case as to K.G.: Perez blamed others for K.G.'s injuries (telling Eli's mother that K.G. had bruises from cancer, telling the police that one of K.G.'s bruises came from a fall in a bathtub, and telling the jury that his father did it), but the bruising found on Eli was similar to the bruising found on K.G., and the abuse on Eli occurred under similar circumstances as the abuse on K.G. (while the child was entrusted in Perez's care by the mother). Although the acts perpetrated on Eli were severe if not horrific, it would have been within the court's discretion to conclude that the evidence of Eli's injuries was not so inflammatory as to create a "*substantial* danger of *undue* prejudice" that "*substantially* outweighed" its probative value. (Evid. Code, § 352, italics added.) Conversely, the probative value of the evidence that Perez abused K.G. was not substantially outweighed by a substantial danger of undue prejudice when admitted in the case as to Eli.

24

such a marked difference in the merit of the cases that would suggest an improper and prejudicial joinder. "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra,* 45 Cal.4th at p. 781.)

Indeed, the case against Perez in regard to K.G. was not particularly weak. K.G. suffered the injuries while she was in Perez's care. Perez maintained to police that her injuries were caused by accidental falls in the park and the bathroom – claiming that K.G. was "clumsy" – but they occurred only when he was around: K.G. did not have this type of bruise until she started living with Perez, and she did not have them after she left. Nor did Officer Agustin find any blood stains in the park where Perez claimed she fell and bled from her head. While Perez points out there were no witnesses who said that Perez abused K.G., there were also no witnesses to corroborate Perez's story. Moreover, Dr. Crawford testified that K.G. suffered bruises of a severity, number, and location that left no doubt they were *not* the result of accidents, but of abuse.

Perez argues that the case as to K.G.'s injuries was weak because at trial – *after* the prosecutor had joined the charges and Perez had failed to make any objection to their joinder – Perez changed his tune and claimed that his father inflicted the injuries upon K.G. But his argument is unconvincing for several reasons. First, Perez's change of story at trial does not demonstrate that the charges would have been severed upon a motion brought *before* trial. Second, Perez's eventual attempt to blame his father for the abuse actually favors a continued joinder of the charges, since Perez made this claim not only as to the injuries inflicted on K.G., but also as to the injuries inflicted upon Eli. Third, Perez's claim that his father abused K.G. (and Eli) did not weaken the case as to K.G.'s injuries (at least no more than it weakened the case as to Eli's injuries), in light of the significant evidence that Perez's father was not around to cause those injuries. N.B. testified that she never left K.G. in Rigoberto's care, and she told the police that K.G. had not been alone with anyone besides N.B. and Perez. On January 24, 2007, the day K.G.

was injured, Rigoberto was not home when N.B. left the house, and Rigoberto's employer (Worthington) testified that Rigoberto was at work that day. Worthington further testified that Rigoberto's work day began at 7:00 a.m. and his 30-minute lunch break began no earlier than 11:00 a.m., disputing Perez's claim at trial that Rigoberto was with him when he took K.G. to the park at 10:00 a.m.

Perez further contends the evidence that he abused K.G. was weak because "Officer Agustin readily agreed that, following his investigation, he did not have probable cause to charge either appellant or [N.B.] with abusing K.G. (RT, vol. 3, p. 602.)" Officer Agustin, however, testified only that he did not have probable cause to arrest Perez or N.B. after taking Perez's initial statement at Children's Hospital, before K.G. had been seen by Dr. Crawford. The officer was *not* asked whether he reached the same conclusion after completing his investigation. Furthermore, joinder is not improper where one "relatively weak" charge was not filed until the evidence regarding the second charge was uncovered. (*People v. Ruiz* (1988) 44 Cal.3d 589, 606-607.) Indeed, "that circumstance is one favoring, rather than disfavoring, joinder of these offenses." (*Ibid*.)

Pursuing yet another theory, Perez now suggests that the case against him as to K.G.'s injuries was weak because the injuries might have been inflicted by K.G.'s *mother*, N.B. But Perez testified under oath at trial that it was his father, Rigoberto, who was responsible for K.G.'s injuries, and never tried to shift blame to N.B. Furthermore, Gamez testified that although N.B. was "eccentric," she was a "very good mother," and Officer Agustin testified to the obvious affection between K.G. and her mother, in contrast to the mutual disinterest between K.G. and Perez at the hospital.

In short, Perez fails to show that the case against him as to K.G.'s injuries was particularly weak, especially since – as Perez sets out in his opening brief – there were some weaknesses in the case as to Eli's injuries as well. Perez therefore fails to establish that joining the offenses was prejudicial on this basis.

Perez's other arguments are unconvincing as well. He urges that the joinder permitted the prosecutor to argue Perez's propensity to perpetrate child abuse and domestic violence, and that Perez's stories to police about an accident in each case were

26

nearly identical (he was with the child, turned away, and the child became injured). However, the propensity of an offender who commits an act of child abuse or domestic violence to continue to commit such acts is the very reason the Legislature enacted Evidence Code section 1109, which allows such evidence. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 705-706; see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 [upholding Evidence Code section 1109 against due process challenge].)[11]

Lastly, in his reply brief, Perez contends that the facts surrounding Eli's death were inflammatory, noting that the court stated during sentencing that he found himself "not being able to look at those pictures of that little baby, little Eli," and called the facts surrounding Eli "sick" and "disturbing." But given at least some degree of cross-admissibility of the evidence and the entirety of the circumstances, the joinder was not so prejudicial that there is a reasonable probability Perez would have won a severance motion and obtained a better outcome if his attorney had objected to the joinder. The general preference for joint trials of offenses properly joined under section 954, as well as the heightened efficiencies from trying the charges together in this case – where both incidents occurred while Perez was supposedly taking care of the victims, and both victims were examined by the same child abuse physician – were amply sufficient to outweigh the claims of prejudice Perez now makes.[12]

---

[11] Perez argues that the prosecutor's propensity argument was improper under *United States v. Bagley* (9th Cir. 1985) 772 F.2d 482. *Bagley* concerned evidence of prior convictions for robbery, not joinder of charges, the admissibility of prior acts of domestic violence or child abuse, or Evidence Code section 1109. (*Bagley,* at pp. 487-488.)

[12] At oral argument, Perez placed much emphasis on *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073 (*Bean*). In *Bean*, the court ruled that the joinder of indictments as to two separate murders deprived the defendant of a fundamentally fair trial, because consolidation of the relatively weak case as to one victim with the compelling case as to the other victim led the jury to infer criminal propensity. (*Id.* at p. 1083.) *Bean* is distinguishable from the matter at hand: in *Bean*, the defendant twice sought severance of the charges, while Perez never sought severance; in *Bean*, the California Supreme Court had determined that the evidence as to each victim was not cross-admissible as to the other victim, but here the evidence was cross-admissible; in *Bean*, there was a "substantial disparity" between the strength of the evidence as to one victim and the

In sum, Perez has failed to make an adequate showing of prejudice arising from the joinder of the charges as to the abuse of K.G. and the charges as to the abuse of Eli. (See *Soper*, *supra,* 45 Cal.4th at p. 774.) Accordingly, he fails to establish that his trial attorney was incompetent for not seeking severance, that it would have been error for the trial court to refuse to sever, or that his attorney's failure to seek severance was prejudicial. He has no ineffective assistance claim on this ground.

2. *Failure to Recall Patricia to Testify*

Perez next asserts his trial counsel was ineffective for failing to recall his sister Patricia to testify about alleged physical abuse of family members by their father, Rigoberto.

The record of defense counsel's cross-examination of Patricia at trial includes the following discourse: "Q. Would you describe your father as mean? [¶] A. Well, he's kind of – he's a nice man, but sometimes he's strong, rude, but he's okay. He's cool, I think. [¶] Q. How old are you now? [¶] A. Twenty-four. [¶] Q. Isn't true that your dad whipped you severely occasionally until you were about 16? [¶] MS. PETTIGREW: Objection. Relevance. [¶] THE COURT: Sustained. You don't have to answer that. [¶] BY MR. GRIM: Q. Do you know of any instance if your dad committing violence against members of your family? [¶] MS. PETTIGREW: Objection. Relevance. [¶] THE COURT: Sustained. You don't have to answer. [¶] BY MR. GRIM: Q. Were you in a sense afraid of your father? [¶] MS. PETTIGREW: Objection. Relevance. [¶] THE COURT: Sustained."

---

strength of the evidence as to the other victim, but here the disparity was not substantial; in *Bean*, the state had no rationale for the joinder other than the convenience of the prosecution, while here respondent points to the fact that Dr. Crawford testified as to both Eli's injuries and K.G.'s injuries; and in *Bean*, the court was concerned that evidence of a prior murder led the jury to infer criminal propensity, while here the evidence of child abuse and domestic violence is expressly authorized to create the inference of criminal propensity under Evidence Code section 1109. (See *Bean, supra*, 163 F.3d at pp. 1083-1086.) In short, because Perez's trial was not prejudiced by joinder, no fundamental unfairness resulted. (Cf. *id*. at p. 1084.) Perez has failed to demonstrate a reasonable probability that the joinder affected the jury's verdicts.

Perez acknowledges that the court ruled correctly because at the time there was no evidence Rigoberto committed child abuse. But once Perez blamed his father for K.G.'s and Eli's injuries, Perez argues, trial counsel should have recalled Patricia to ask her again about her father's alleged abuse.

As Perez concedes, however, we do not know what Patricia would have said if called again to testify. Perez states that he will therefore pursue the issue in a separately filed petition for writ of habeas corpus. Specifically, he states: "Appellant contends that defense counsel was ineffective not to recall Patricia as a defense witness. *This issue cannot be fully explored on direct appeal* because the record does not disclose what answers Patricia would have given in response to defense counsel's questions. Appellant intends to file a companion habeas corpus petition in which the existing record can be expanded with the answers Patricia would have given and defense counsel's ineffectiveness fully explored." (Italics added.)

We agree that the record before us in this appeal is insufficient for Perez to establish ineffective assistance of counsel on this ground. In addition, Perez has not established in this appeal that Patricia's being recalled to the stand would have changed the result of the trial – regardless of what she would have said about Rigoberto's actions against her or other family members – in light of the evidence that Rigoberto was not with the children on the days they were injured.

Perez has failed to establish ineffective assistance on this ground.

### 3. *Failure to Object to Prosecutor's Argument About Chest Bruises*

As mentioned, the prosecutor stated in closing argument that K.G. and Eli had "the exact same bruise in the exact same place." Perez argues that his attorney's failure to object to this argument as a misrepresentation of the record constitutes ineffective assistance of counsel, and the potential for prejudice was substantial.

As set forth *ante*, the prosecutor did not commit prosecutorial misconduct in her statements about the chest bruises on K.G. and Eli. It was therefore not unreasonable for defense counsel to withhold an objection, and no prejudice arose from the failure to object. Perez fails to establish ineffective assistance of counsel on this ground.

29

4.  *Failure to Object to Prosecutor's Argument Regarding Abortion*

Perez argues that counsel should have objected and perhaps moved for a mistrial based on the prosecutor's statement that equated Perez's request for an abortion of Rojas' pregnancy with a desire to harm K.G. and Eli so he would not have to take care of them. However, the prosecutor did not commit prosecutorial misconduct by this statement, for reasons discussed *ante*.  Accordingly, it was not incompetent for defense counsel to refrain from objecting, and no prejudice arose from the absence of an objection.

Perez fails to establish ineffective assistance of counsel.

### III.  DISPOSITION

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

SIMONS, J.

30